IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

ANDRE JAVION PORTEE,

       Plaintiff,

v.                                  Case No. 2:15-cv-13928

UNITED STATES DEPARTMENT OF
AGRICULTURE, OFFICE OF THE ASSISTANT
SECRETARY FOR CIVIL RIGHTS, and
SONNY PERDUE[1],

       Defendants.

## PROPOSED FINDINGS AND RECOMMENDATION

This matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).  Pending before the court are the plaintiff's Motion for Summary Judgment (ECF No. 32) and the defendant's Motion for Summary Judgment (ECF No. 34).

## PROCEDURAL HISTORY

The plaintiff commenced this civil action under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-706, for judicial review of a Final Agency Decision by the United States Department of Agriculture's ("USDA") Office of the Assistant Secretary of Civil Rights ("OASCR") dated August 19, 2015.  The Final Agency Decision concluded that the

---

[1] Sonny Purdue, the current Secretary of Agriculture is substituted in place of Thomas J, Vilsak.

Department of Agriculture's National Resources Conservation Services ("NRCS") did not discriminate against the plaintiff on the bases of color, sex, national origin, retaliation, or age, concerning his participation in the Donloup Creek Watershed Voluntary Floodplain Buyout Program ("the Buyout Program").[2]  The specific findings made in the Final Agency Decision will be discussed as necessary *infra*.

On January 5, 2018, the plaintiff filed a Motion for Summary Judgment (ECF No. 32).  The defendants filed a Response to the plaintiff's Motion for Summary Judgment (ECF No. 37) on March 6, 2018.  The plaintiff did not file a reply brief.

The defendants filed their own Motion for Summary Judgment (ECF No. 34) on February 6, 2018.  The undersigned notified the *pro se* plaintiff of his right and obligation to file a response to the defendants' Motion for Summary Judgment (ECF No. 38).  On March 30, 2018, the plaintiff filed a Response to the defendants' Motion for Summary Judgment (ECF No. 39).  On April 11, 2018, the defendants filed a Reply to the plaintiff's Response to their Motion for Summary Judgment (ECF No. 40).  This matter is ripe for adjudication.

## STANDARD OF REVIEW

The scope of review in this case is limited.  As noted by the defendants, administrative proceedings before OASCR are authorized by 7 C.F.R. Part 15d.  Because there was no formal hearing, this was an informal adjudication, which is governed by 5 U.S.C. § 706(a)(2)(A).  Under the APA, the reviewing court must uphold the Agency's

---

[2] The plaintiff's Response to the defendants' Motion for Summary Judgment focuses only on his claims of race discrimination.  Thus, at this point in the proceedings, it appears that the plaintiff has abandoned all bases for his claims except for race discrimination.

2

decision unless it is arbitrary and capricious, an abuse of discretion, not supported by substantial evidence, or contrary to law.  5 U.S.C. § 706(2)(A).

Under the arbitrary and capricious standard, a court may set aside an agency action where the agency:  (1) relied on factors which Congress did not intend for it to consider; (2) entirely failed to consider an important aspect of the problem; (3) offered an explanation for its decision that runs counter to the evidence before the agency; or (4) offered an explanation that is so implausible that it could not be ascribed to a difference in view or a product of agency expertise.  *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983).  Review under the arbitrary and capricious standard is "searching and careful," but narrow."  *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 377-78 (1989).  "[R]eview under this standard is highly deferential with a presumption in favor of finding the agency action valid."  *King v. Burwell*, 759 F.3d 358, 373 (4th Cir. 2014).

The ultimate question is whether the agency's decision is reasonable.  *FCC v. Fox Television Stations*, 556 U.S. 502, 514-15 (2009).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dickinson*.  "[S]ummary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 770 (9th Cir. 1985).

Under Rule 56(a) of the Federal Rules of Civil Procedure, the court shall grant summary judgment "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). Material facts are those necessary to establish the elements of a party's cause of action.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. *Id.* The moving party has the burden of establishing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

A court must not resolve disputed facts, weigh the evidence, or make determinations of credibility. *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995); *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and to have all internal conflicts resolved in his or her favor. *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). However, the party opposing the motion may not rely upon mere allegations or denials of the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Sprenkle v. Hartford Life Ins. Co.*, 84 F. Supp. 2d 751 (N.D. W. Va. 2000).

## **ADMINISTRATIVE RECORD**

The Administrative Record ("AR")[3] in this case consists of the Final Agency Decision and the Report of Investigation ("Report") prepared by OASCR in response to the plaintiff's Program Discrimination Complaint Form. The Report includes the

---

[3] The pages numbers of the Administrative Record are typed in the upper left corner of each page.

investigator's findings and analysis of the evidence (AR 1-18); the plaintiff's Program Discrimination Complaint Form (AR 20-24); the plaintiff's supporting affidavit (AR 25-43); the plaintiff's supporting documentation (AR 44-137); NRCS's Position Statement and supporting documentation (AR 138-222); statements of NRCS employees (AR 223-241); the regulations applicable to the Buyout Program (AR 243-253); and data and statistics pertaining to the Buyout Program (AR 254-265).

## RELEVANT FACTS AND AGENCY FINDINGS

### *The Buyout Program*

In the spring and summer of 2009, federal, state, and local authorities created the Buyout Program in response to recurring floods in communities and settlements along Dunloup Creek, in and around Mount Hope, West Virginia. (AR 233-234). The Buyout Program, which was authorized under the Watershed Protection and Flood Prevention Act, 16 U.S.C. § 1001 *et seq.*, covered an area of approximately 200 acres and potentially involved approximately 290 properties in Fayette and Raleigh counties, where flood-proofing measures had proven ineffective.

The NRCS office in Beckley, West Virginia, which administered the Buyout Program, accepted buyout applications from property owners from June 10, 2009, to September 1, 2009. (AR 233). Pursuant to a "Watershed Agreement" among the federal, state and local authorities involved, the NRCS provided 90% of the funding, and the state and local sponsors provided the other 10%. (AR 243-253). The Buyout Program acquired eligible properties as long as funding was available. Ultimately, 198 property owners applied for and received buyouts under the Program. (AR 229). Once an agreement on

the purchase price was reached between NRCS and the property owner, the property was transferred to either the Fayette County Commission or the City of Mount Hope.  (*Id.*)

Particularly significant to this litigation are the ranking of the buyout applications and the requirement that a property owner be able to demonstrate "clear, insurable title." NRCS ranked and processed the applications based upon three criteria:  (1) the date the application was received by NRCS; (2) the location of the property within the 100-year floodplain; and (3) the classification of property based upon its use.  The Buyout Program classified 10 possible uses for the property and the applicant was expected to designate the appropriate use and provide support therefore.  (AR 56).  Relevant here are the classifications for "Rental property (rented at least 6 months of most recent year)" and "Vacant residence."  (*Id.*)  Ultimately, the rank of the applications became irrelevant because the Buyout Program had sufficient funding for all applicants.  (AR 100-101).

Additionally, to be eligible for a buyout, a property owner must demonstrate that he could pass clear, insurable title.  Under 42 U.S.C. §§ 3111(a) and (b), public funds may not be used to acquire land without the prior written approval of the Attorney General, or someone to whom the Attorney General has delegated such authority.  In this case, the Attorney General delegated his authority to the USDA.  (ECF No. 34, Ex. 1).  However, the Attorney General expressly conditioned the delegation on the requirement that the title acquired by USDA be supported either by a certification that the titled is clear of potential encumbrances or by title insurance.  (*Id.*)

### *The plaintiff's acquisition of his property and his buyout application*

The plaintiff purchased the property in question (308 Lincoln Street, Mount Hope, West Virginia) ("the property") for $600 at a tax lien sale conducted by the Deputy

Commissioner of Delinquent and Nonentered Lands of Fayette County, West Virginia. (AR 53, 146).  By deed dated March 11, 2009, the Deputy Commissioner transferred title to the property to the plaintiff.  (*Id.*)

On June 30, 2009, the plaintiff filed an "Application to Voluntarily Sell Floodplain Property" with NRCS.  (AR 55-56).[4]  On the second page of his Application, the plaintiff represented that the primary use of the property was "Rental property (rented at least 6 months of the most recent year")" and that he was "Fixing up For Rental."  (AR 56).  The Application instructed the plaintiff to attach copies of any rental agreements for the property, but he did not attach anything.  (AR 56).  By letter dated September 30, 2009, the NRCS acknowledged receipt of the plaintiff's Application and informed him that, based upon the information therein and the location of the property within the floodplain, his Application was ranked as number 167 out of 198 applications then filed.  (AR 57).

However, by letter dated December 28, 2012, NRCS informed the plaintiff that he had not submitted documentation to support that the property had been rented for six months prior to his buyout application.  Thus, NRCS requested that, within 14 days, the plaintiff submit documentation showing that "the property was in rental status **for at least six months** prior to making the application."  (AR 58) (Emphasis in original).  NRCS further notified the plaintiff that the failure to provide such documentation would result in the change of the classification of his property to "vacant residence," which would adjust his rank accordingly.  (*Id.*)

---

[4]  The plaintiff signed the Application on June 16, 2009; however, it is marked as "Received" by the NRCS Beckley office on June 30, 2009, which is considered the filing date.

On or about January 2, 2013, the plaintiff submitted a document titled "Portee LTD Corp Rental/Lease Agreement Month-to-Month" dated February 3, 2009, along with eight rental receipts dated the third day of February, March, April, May, June, July, August, and September of 2009, and a letter from American Electric Power ("AEP") indicating that the electric service for the property was activated on March 20, 2009. (AR 152-157). By letter dated January 8, 2013, NRCS informed the plaintiff that the documentation he had provided did not establish that he had owned and rented the property for at least six months prior to his June 30, 2009 Application. (AR 62).

NRCS specifically noted that the Rental Agreement and the February and March rental receipts pre-dated the March 11, 2009 deed transferring title of the property to the plaintiff. The letter further noted that the letter from AEP indicated that the power was not activated until March 20, 2009. (*Id.*) Consequently, NRCS found that the plaintiff had failed to demonstrate that he rented the property for six months prior to his buyout application and, thus, the property should be reclassified as a vacant residence and ranked accordingly. (*Id.*)

By letter dated January 11, 2013, the plaintiff contested NRCS's determination that the property was a vacant residence. (AR 167-183). He further argued that the September 30, 2009 letter from NRCS acknowledging his Application and ranking him at 167 was a "binding contract" and that the six-month rental period should run from that date. (AR 167).

By letter dated January 24, 2013, NRCS responded to the plaintiff's "appeal" letter, asserting that it had correctly reclassified the property as a vacant residence based on the documentation the plaintiff had provided. This reclassification dropped the ranking of

the plaintiff's Application from 167 to 179.  (AR 184).  The plaintiff's property remained classified as a vacant residence for the duration of the Buyout Program.

### *The issue of clear, insurable title*

As noted by the defendants, at least five applicants, including the plaintiff, experienced problems satisfying the Buyout Program's "clear, insurable title" requirement because they had acquired their properties at tax sales.  (AR 238-241).  By letter dated June 20, 2013, the attorney for the Buyout Program, James C. Blankenship, III (who is not an employee of the NRCS or the USDA) informed NRCS of a problem with the plaintiff's title.  Specifically, Mr. Blankenship asserted that West Virginia Code § 11A-4-6 gave the previous landowner's heirs and assignees who were infants or mentally incapacitated at the time of the sale 20 years to redeem the property.  Thus, First American Title Company would not issue a title insurance policy for the plaintiff's property that did not include an exclusion for W. Va. Code § 11A-4-6, and NRCS could not accept a policy with such an exclusion.  Thus, the plaintiff's property did not qualify for purchase in the Buyout Program.  (AR 194-195).

By letter dated June 24, 2013, NRCS forwarded Mr. Blankenship's letter to the plaintiff, and informed him that, since he could not transfer clear, insurable title to the property, NRCS was prohibited from acquiring it.  (AR 193).  However, NRCS advised the plaintiff that he had 30 days to attempt to cure his title problems.  (*Id.*)

By letter dated September 12, 2013, the plaintiff responded to NRCS's June 24, 2013 letter asserting that the previous owner of the property had no heirs who were infants or mentally incapacitated at the time of the tax sale.  (AR 196-211).  By letter dated October 22, 2013, NRCS advised the plaintiff that his prior letter did not resolve the title

9

issue and, if he did not resolve the title issue by December 1, 2013, NRCS would consider his Application withdrawn. (AR 89). The plaintiff responded by letter dated November 1, 2013, opining that the state statute was irrelevant and did not create a cloud on his title. (AR 91-97). Additionally, the plaintiff demanded that his rank be restored to 167 and that he receive a $30,000 incentive payment available to owners of rental property. (*Id.*) The plaintiff threatened to file a civil action if NRCS did not comply with his demands. (AR 92).

Additional correspondence between the plaintiff and NRCS demonstrates the continued debate over the application of W. Va. Code § 11A-4-6 and attempts to resolve the title issue. (AR 98-101). By letter dated November 26, 2013, NRCS continued to express its position, based upon Mr. Blankenship's advice, that the redemption rights under the state statute clouded the plaintiff's title and that the property was ineligible for the buyout program. NRCS also continued to classify the property as a vacant residence. However, NRCS advised the plaintiff that the ranking was no longer important because the Program had sufficient funds to buy his property, assuming resolution of the title issue. (*Id.* at 100-101).

By letter dated December 2, 2013, NRCS responded to the plaintiff's November 1, 2013 letter, and extended the deadline for resolving the title issue to December 13, 2013. (AR 102). On December 3, 2013, OASCR received the plaintiff's "Program Discrimination Complaint Form," which was executed by the plaintiff on November 30, 2013, and included NRCS's November 26, 2013 letter as an attachment. (AR 20-24). The plaintiff alleged that his disputes with NRCS and Mr. Blankenship concerning the property and

the buyout program were the product of discrimination based on "color, national origin, sex, age family." (AR 21).

On or about April 16, 2014, Mr. Blankenship advised NRCS that Old Republic National Title Insurance Company had agreed to underwrite title insurance for the plaintiff's property and, thus, the property was eligible for purchase in the Buyout Program. (AR 142, 165). On June 11, 2014, the plaintiff executed an "Offer to Sell Real Property" to the Fayette County Commission for $77,000. (AR 235). On July 18, 2014, the sale closed and title of the property was transferred to the City of Mount Hope. (AR 116-122). The plaintiff did not receive the requested $30,000 incentive payment because his property was classified as a vacant residence.

### *Investigation and Adjudication of Discrimination Complaint*

The investigation of the plaintiff's discrimination Complaint took place from March 18, 2015 to April 23, 2015. The investigator's Report was completed on May 29, 2015. (AR 1). Based upon the plaintiff's statements and documentation, the investigator identified five allegations of discrimination:

1.    Delayed in processing his application in the Dunloup Creek Watershed Buyout Project from January 2012 through the present;

2.    Refused to issue a title and the issuance of title insurance on his property from January 2012 through the present;

3.    In January 2012, he called for a status on his application and was told his ranking status and his property had changed from rental property to vacate [sic; vacant] property;

4.    In June 2012, removed his name off a list of participants for the Dunloup Watershed Buyout Project; and

11

5.      In January 2013 and December 2, 2013, refused and/or denied his
        request to clear the title and informed him that his application would
        be withdrawn as of December 13, 2013, if he could not clear the title.

(AR 1).

After reviewing the evidence presented by the plaintiff, NRCS, and the investigator's Report, OASCR issued a Final Agency Decision dated August 19, 2015, finding that the plaintiff did not suffer discrimination in any form.  (ECF No. 24, Attach. 2).  Analyzing the plaintiff's claims under the standard set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and assuming that the plaintiff had established a *prima facie* case of discrimination, OASCR found that NRCS had articulated legitimate, nondiscriminatory reasons for the actions about which the plaintiff complained.  (*Id.* at 8-9).

OASCR further found that NRCS complied with agency rules and procedures with respect to the processing of the plaintiff's Application, the classification of his property, and the clear, insurable title requirement.  (*Id.*)  Additionally, OASCR found that the plaintiff failed to produce any evidence that NRCS's articulated reasons for its actions were either untrue or pretextual.  (*Id.* at 12).  OASCR further found that the plaintiff could not make a *prima facie* case of retaliation or reprisal based upon familial ties or any previous protected activity.  (*Id.* at 12-13).

## ANALYSIS

### A.    The parties' arguments.

The defendants' Motion for Summary Judgment asserts that it is clear from the Administrative Record that OASCR's Final Agency Decision is not arbitrary or capricious and that the defendants are entitled to judgment as a matter of law.  They identify three

aspects of the plaintiff's allegations on which his arguments appear to focus:  (1) the delay in processing his Application; (2) the classification of the property as a vacant residence and the resulting impact on the ranking of his Application; and (3) NRCS's insistence that the plaintiff provide clear title to the property.  (ECF No. 35 at 19-20).

The defendants contend that the undisputed evidence of record shows that the plaintiff filed his Application on June 30, 2009, and was ranked 167 out of 198 applications at that time.  (*Id.* at 20).  The defendants contend that any "delay" in processing of his Application "was caused by the processing of at least 166 applications ranked ahead of his."  (*Id.* at 20).  They further assert that there is no evidence indicating that any delay was for a discriminatory reason.  (*Id.*)

With respect to the reclassification of the property, the defendants contend that the plaintiff failed to demonstrate that he had owned and rented the property for six months preceding his Application.  (*Id.* at 21).  In fact, the evidence of record demonstrates that the plaintiff was not the legal owner of the property until March 11, 2009 and, thus, his documentation indicating that the property was in rental status in February of 2009, is insufficient to satisfy the criteria.  (*Id.*)  The defendant's Memorandum of Law further states:

> Even when viewed most favorably to Mr. Portee, this evidence shows clearly that Mr. Portee leased the Lincoln Street Property for only five months prior to his June 30, 2009, Application, rather than the required six months.  Indeed, to believe that Mr. Portee leased the Lincoln Street Property for even five months, one must believe that he leased the Property for 36 days before he actually owned it.  These facts and the inferences to be drawn from them establish beyond doubt that the Lincoln Street Property failed to qualify as rental property under the objective criteria governing the Buyout Program.  Nothing in the record gives the slightest hint that these criteria were applied to Mr. Portee in a discriminatory manner.

(*Id.* at 22-23).

Finally, concerning the clear title issue, the defendants contend that, in the opinion of legal counsel, the plaintiff's title to the property was clouded by state laws governing redemption rights of properties purchased through tax sales, and they could not find a title insurance company willing to underwrite title insurance for the property.  Thus, the property was not eligible for purchase in the Buyout Program unless those matters could be remedied.  (ECF No. 35 at 23).  The defendants note that similar issues affected at least four other applicants.  (*Id.*)

However, on or about April 16, 2014, Mr. Blankenship notified NRCS that a title insurance company was willing to insure the plaintiff's title and, thus, the property was eligible for the Buyout Program.  (*Id.* at 23).  The sale of the property was then completed on July 18, 2014.  (*Id.* at 24).  The defendants' Memorandum of Law asserts:

> This evidence establishes conclusively that NRCS relied on the opinion of a highly qualified and well-regarded title attorney that the redemption right created by West Virginia Code § 11A-4-6 created a cloud on Mr. Portee's title.  Moreover, rather than discriminating against Mr. Portee, Mr. Blankenship and NRCS solved Mr. Portee's problem for him by finding a title insurance company that was willing to insure his title.  As a result of these efforts, Mr. Portee was able to sell for $77,000 a property he acquired at a tax sale for $600.  At no point did Mr. Portee suffer discrimination.

(*Id.*)

Both the plaintiff's Motion for Summary Judgment (ECF No. 32) and his Response to the defendants' Motion for Summary Judgment (ECF No. 39) generally assert that the defendants should be held liable for discrimination in this case because of a prior finding of discrimination by the USDA concerning black farmers.  *See Pigford v. Glickman*, 185 F.R.D. 82 (D.D.C. 1999) (approving consent decree), *aff'd,* 206 F.3d 1212 (D.C. Cir. 2000).

14

The plaintiff's briefs also heavily rely upon a letter dated February 7, 2013 from Louis E. Aspey, II, Acting State Conservationist, to Congressman Nick J. Rahall, which, despite the plaintiff's assertions to the contrary, appears several times in the Administrative Record. (AR 69, 128, and 185). The plaintiff's Motion for Summary Judgment suggests that this letter, which addressed the status of the plaintiff's property ranking and classification in the Buyout Program, was an order from the supervisor of NRCS staff member Gary Redden, who was implementing the Buyout Program, to classify the plaintiff's property as rental property, thus making him eligible for the $30,000 incentive payment and restoration of his original Application rank of 167, and that Mr. Redden and others failed to follow that order. (ECF No. 32 at 2).

Additionally, his Response to the defendants' Motion for Summary Judgment states:

> "Memo states – It should also be noted, the incentive will be on rental property and not offered on classified vacant property. Please take note the Defendant never addressed this exhibit or memo." The Plaintiff states he was the only one that this was done to and equates to "RACIAL DESCRIMINATION [sic; discrimination] at present the dwelling was not sold as rental property. See – Exhibit 37 August 5, 2014 not given the incentive because of vacant property by Gary Redden. In February 7, 2013, told but still loose cannon and racial discriminating Mr. Redden not listening to his bosses. He never did what was told to the congressman by his superiors to be in the near future in memo to said congressman whom is the one whom allocated funds for the program. Gary Redden goal was to racial discriminate the Plaintiff not for him to remain in the program. His ways and actions have spoken louder than any words. He had notice of said memo but that was not of his agenda to do with the Plaintiff. No one but the Plaintiff was treated this way. The memo is self-explanatory in its self.

(ECF No. 39 at 1). Thus, the plaintiff contends that Mr. Redden and the NRCS did not follow orders to buy the property as rental property and, thus, denied the plaintiff the $30,000 incentive. (*Id.*) He further asserts that he was treated differently concerning

the six-month rental requirement, when his paperwork was not accepted as demonstrating proof of rentals for six months, which resulted in his drop in ranking. (*Id.* at 3).

The plaintiff's Response to the defendants' Motion for Summary Judgment further contends that Mr. Blankenship demonstrated racial discrimination against him concerning his ability to obtain clear title to the property. The plaintiff asserts that Mr. Blankenship misinterpreted the state statutes on title rights following tax sales and used W. Va. Code § 11A-4-6 to discriminate against him. (*Id.* at 2). The plaintiff further contends that he was treated differently than other similar applicants because Mr. Blankenship did not tell him he could get his own title insurance. (*Id.*)

The plaintiff further suggests that the repeated threats by the defendants to withdraw his Application from the Buyout Program if he did not satisfy their requests for compliance with the clear title requirement constituted racial discrimination. (*Id.* at 3). The plaintiff asserts that it was the goal of Gary Redden to racially discriminate against him and to not allow him to remain in the Buyout Program. (*Id.*)

The defendant's Response to the plaintiff's Motion for Summary Judgment (ECF No. 37) and their Reply to the plaintiff's Response to their Motion for Summary Judgment (ECF No. 40) assert that the plaintiff has not demonstrated any actual evidence to support his claims of race discrimination. The Response asserts:

> Mr. Portee does not reference a single page in the record, nor does he cite a single fact or relevant precedent, to show that he suffered discrimination in any form. Instead, Mr. Portee's allegations of discrimination flow from one misbegotten theory – USDA's Natural Resources Conservation Service unlawfully discriminated against him because it did not give him exactly what he wanted. * * * [T]he record shows that the NRCS applied the regulations governing the Dunloup Creek Voluntary Floodplain Buyout

Program in a non-discriminatory manner and went out of its way to accommodate Mr. Portee.

(ECF No. 37 at 2). Their Reply brief further asserts that the plaintiff has incorrectly asserted that the February 7, 2013 letter upon which he relies was not in the Administrative Record; that he has not demonstrated that he owned and rented the property for at least six months preceding the submission of his Application; and that he is relying upon a flawed interpretation of W. Va. Code § 11A-4-6. (ECF No. 40 at 2-3).

The defendants assert that the plaintiff's position is based upon "wholly unsupported suppositions concerning the motives and actions of persons who tried to help him; and a recitation of cases, statutes and rules that are either irrelevant or misapplied." (*Id.* at 3). Accordingly, they contend that he has "failed to show any factual or legal error in the Final Agency Decision that would render it arbitrary, capricious, contrary to law, or an abuse of discretion." (*Id.*) Therefore, they request that the Final Agency Decision be affirmed.

**B.    The Final Agency Decision.**

As noted in the Final Agency Decision, in order for the plaintiff to demonstrate a claim of disparate treatment herein, he must establish a *prima facie* case by demonstrating the following:

(1) The plaintiff is a member of a protected class; (2) the plaintiff applied for and was eligible to receive the benefit sought; (3) despite the plaintiff's eligibility, he or she was rejected, referred elsewhere, or treated differently, or otherwise subjected to an adverse action; and (4) the Agency/defendant accepted or treated more favorably similarly situated applicants who were not members of the protected class or classes, or there exists some other evidence sufficient to create an inference of discrimination.

(ECF No. 24, Attach. 2 at 7) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

Once a *prima facie* case is established, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. *See Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). If the defendant offers such a reason, the burden returns to the plaintiff to show, by a preponderance of the evidence, that the Agency's reasons are a pretext for discrimination. *See McDonnell Douglas*, 411 U.S. at 804-05. The ultimate burden of persuasion lies with the plaintiff. *Burdine*, 450 U.S. at 256.

In the instant matter, the OASCR assumed that the plaintiff could establish a *prima facie* case of disparate treatment. (ECF No. 24, Attach. 2 at 8). Thus, the focus of the decision was on whether the Agency offered legitimate, nondiscriminatory reasons for its actions, which were not a pretext for discrimination. Of note, the Final Agency Decision found no evidence of delay tactics or non-responsiveness, and that the Agency never withdrew the plaintiff's Application. (*Id.* at 10).

The Final Agency Decision further found that the plaintiff's allegations of discrimination on the part of the Agency with regard to the title insurance issue were unsubstantiated, and that there were at least four other property owners who were similarly treated. (*Id.* at 11). The Final Agency Decision again noted that the plaintiff's name was not withdrawn from the Buyout Program, and that "NRCS continued to afford the Complainant the opportunity to participate in the Project even though he missed the deadline to provide a clean marketable title." (*Id.*)

Finally, concerning the property ranking and classification, the Final Agency Decision states in pertinent part:

> The Complainant did not provide verifiable documents proving he was renting the property for 6 months prior to applying for the Project.  Instead, he debated whether the 6 months should be calculated from the date that NRCS provided the letter informing him of his ranking.  Further, when presented with the Office of General Counsel's opinion which supported the ranking of his property as vacant, the Complainant refused to consider reapplying for the Buyout Project in order to have his property classified as a rental and qualify for the incentive.
>
> * * *
>
> We find that the Agency's decision to classify the subject property as a vacant residence, thereby also changing the priority ranking, was consistent with applicable program rules and not based on discriminatory animus.
>
> * * *
>
> The Complainant's affidavit and rebuttal do not provide sufficient evidence to infer he was treated less favorably than similarly-situated individuals not of his protected class.
>
> Based on the foregoing information, we find that the Complainant does not establish that the Agency's articulated reasons were untrue or a mere pretext for discrimination.  Therefore, the Complainant does not demonstrate discrimination with regard to the alleged bases of color, sex, national origin, and age in the subject complaint.

(*Id.* at 12).

The Final Agency decision further found that the plaintiff could not establish a *prima facie* case of reprisal discrimination (or retaliation) concerning his treatment by NCRS with respect to the Buyout Program.  In order to state a prima facie case of retaliation under Title VII, a plaintiff must prove: (1) he engaged in protected activity; (2) the Agency had knowledge of the protected activity; (3) the plaintiff subsequently suffered

an adverse action; and (4) there is a causal link between the protected activity and the adverse action.

The Final Agency Decision found that the plaintiff could not establish the first prong above, despite his assertion that the issues he encountered during the Buyout Program were potentially because his mother was a Mount Hope City Councilwoman, because his relationship with his mother is insufficient to qualify as protected activity. Likewise, the Final Agency Decision noted that the plaintiff had not demonstrated that he had previously engaged in any protected activity.  Thus, his retaliation claim was dismissed because he could not establish a *prima facie* case of retaliation/reprisal.

Upon an exhaustive review of the Administrative Record, the undersigned proposes that the presiding District Judge **FIND** that the Final Agency Decision is supported by substantial evidence, and that it is not arbitrary or capricious, an abuse of discretion, or contrary to law.  Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that there is no genuine issue of material fact and that the defendants are entitled to judgment as a matter of law herein.

## **<u>RECOMMENDATION</u>**

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **DENY** the plaintiff's Motion for Summary Judgment (ECF No. 32), **GRANT** the defendants' Motion for Summary Judgment (ECF No. 34), and dismiss this matter from the docket of the court.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge.  Pursuant to the provisions of Title 28, United States Code,

Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).  Copies of such objections shall be provided to the opposing party and Judge Copenhaver.

The Clerk is directed to file this Proposed Findings and Recommendation, mail a copy of the same to the plaintiff and transmit a copy to counsel of record.

July 24, 2018

Dwane L. Tinsley
United States Magistrate Judge

21